

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-12-00517-CV

DALLAS AREA RAPID TRANSIT                     APPELLANTS
("DART") AND FORT WORTH
TRANSPORTATION AUTHORITY
(THE "T")

V.

AGENT SYSTEMS, INC.                           APPELLEE

----------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 236-226246-07

----------

## MEMORANDUM OPINION[1]

----------

DART and the T appeal from a judgment on a jury verdict in favor of Agent

Systems, Inc. In six issues, appellants challenge the standard of review

applicable to Agent's claims, the trial court's jury charge, the sufficiency of the

---

[1]*See* Tex. R. App. P. 47.4.

evidence, and the award of prejudgment and postjudgment interest.[2]  We affirm in part, and we reverse in part and remand for a recalculation of prejudgment and postjudgment interest.

### Factual and Procedural Background

In 1999, appellants entered into an Interlocal Agreement to acquire technology for a vehicle business system, or VBS, in their respective buses, to be funded largely by the federal government.  The VBS was to include integrated components, such as cameras, passenger counting systems, and other equipment, that would allow information to be exchanged more readily between appellants, as well as between appellants and the public.  In conjunction with the VBS, appellants sought bids for the delivery and installation of new bus fareboxes that would integrate with the VBS.  At the time, the buses used registering fareboxes, which do not distinguish among the types of coins or bills inserted and do not store electronic information.  Appellants sought bids for the delivery and installation of validating fareboxes, which at the time was a fairly new technology for buses.  A validating farebox uses electronic technology to distinguish among the types of bills and coins and is supposed to reject any items that are not bills or coins; it also keeps an internal record of amounts received.

---

[2]Appellants initially raised seven issues, but they conceded their second issue in their reply brief.

After receiving a bid for validating fareboxes from Agent, DART performed tests on Agent's prototype in its engineering facility. Although the prototype boxes did not meet all of the threshold requirements set by DART, appellants nevertheless decided to enter into a contract with Agent. The parties signed a contract in August 2000. Detailed specifications for the fareboxes were included in the contract documents.

In accordance with the contract, Agent installed boxes conforming to the prototype in twenty T buses; however, the installation began and was completed later than called for in the contract schedule. The contract provided that upon installation of these first twenty boxes, the parties would engage in field testing them, a process called the in-service qualification test (ISQT). The ISQT was to be administered by the T in cooperation with Agent, with review by DART. During the ISQT, the fareboxes repeatedly failed to meet the benchmark performance standards agreed to by the parties, but appellants and Agent dispute the reasons and the actual results of some of the tests. Nevertheless, Agent continued to modify the product in response to the observed problems. The parties extended the time for the ISQT to be completed several times, and at one point, appellants suspended the ISQT. When the ISQT was reinstated, the parties continued to work on modifications to the fareboxes. Eventually, however, appellants decided that Agent's proposed corrective actions were unacceptable to them and sent Agent a letter suspending the ISQT indefinitely.

Because Agent had preordered parts and supplies to fulfill its obligation to install approximately 1,100 fareboxes after completion of the ISQT and could not pay its outstanding invoices, it filed for Chapter 11 bankruptcy in November 2001. While the bankruptcy was pending, appellants sent an accountant to Agent's premises to confirm what expenses appellants would have to pay if they terminated the contract under the termination for convenience clause. Additionally, the parties settled Agent's claim for payment of invoices for the completed fareboxes that had been installed in the T buses. The T bid for new registering fareboxes from a different vendor in 2002.

After completion of the bankruptcy proceedings, Agent, having received no contract termination notice from appellants, sued appellants for amounts due under the termination for convenience provision of the contract. Appellants responded by sending Agent a written notice terminating the contract under the default provision. In 2004, the trial court granted appellants' pleas to the jurisdiction for Agent's failure to exhaust administrative remedies. The parties then submitted the dispute to an administrative law judge, in accordance with the T's procurement regulations, which were incorporated into the contract. The ALJ determined that appellants had terminated the contract for convenience rather than for Agent's default; nevertheless, the ALJ declined to award Agent any amounts over and above what appellants had already paid by settlement or otherwise. Although Agent obtained a continuance to file a motion for rehearing of the ALJ's decision, it did not do so.

4

Agent subsequently filed this suit in 2007, bringing substantially the same claims it brought in 2003. Although DART filed a plea to the jurisdiction, the trial court denied it, and this court affirmed the trial court's order as to the breach of contract claim. *DART v. Agent Sys., Inc.*, No. 02-08-156-CV, 2008 WL 4938097, at *1, *4 (Tex. App.—Fort Worth Nov. 20, 2008, pet. denied) (mem. op.). Thereafter, Agent filed its fourth amended petition, in which it claimed that appellants' immunity from suit and liability on its breach of contract claims is waived in accordance with chapter 271 of the government code.

A jury found that both appellants and Agent had failed to comply with the contract but that appellants' failure to comply was not excused. The jury found that Agent should be awarded damages of $850,000 for its "costs, including contract close-out costs incurred . . . but not including profit." The trial court rendered judgment against appellants, jointly and severally, for that amount, plus $566,397 in prejudgment interest, all bearing postjudgment interest at six percent.

### Substantial Evidence Standard of Review Does Not Apply

In their first issue, appellants contend that the trial court erred by conducting a trial de novo on Agent's claims rather than conducting a substantial evidence review of the ALJ's decision.

In the prior appeal, this court held that the contract's dispute resolution procedures did not deprive the trial court of jurisdiction over the suit. *Id.* at *3. The contract requires Agent to exhaust its administrative remedies under chapter

5

10 of the T's procurement regulations or the disputes clause of the contract "prior to seeking *judicial relief of any type* in connection with any matter related to . . . any dispute under any resulting contract." [Emphasis added.] *Id.* The procurement regulations provide that "[s]ubject only to reconsideration under Rule 29, the decisions will be final and not subject to review or modification *by the Authority's Executive Committee*" and that the parties may seek "judicial review" of the ALJ's decision "under the standard of review permitted by the Disputes Clause [of the contract]." [Emphasis added.] *Id.* The disputes clause in the contract between appellants and Agent does not set forth any standard of review for judicial review of the ALJ's decision. However, it also provides that

> [t]he duties and obligations imposed by [the contract] . . . , and the rights and remedies thereunder shall be *in addition to and not a limitation of* any duties, obligations, rights and remedies otherwise imposed or available by law. No action or failure to act by the T shall constitute a waiver of any right or duty afforded either party under the contract, nor shall any such action or failure to act constitute an approval of or acquiescence in any breach under . . . any such contract, except as may be specifically agreed in writing. [Emphasis added.]

We previously held that the contract does not prohibit subsequent judicial relief. *Id.* Appellants contend, however, that the only form of judicial relief available under the contract and procurement regulations is judicial review of the ALJ's decision pursuant to the substantial evidence rule only and not a trial de novo. Appellants do not dispute that Agent exhausted its administrative remedies under chapter 10 of the T's procurement regulations.

6

DART argues that the procurement regulations have the force and effect of statute. *See Lewis v. Jacksonville Bldg. & Loan Assoc.*, 540 S.W.2d 307, 310 (Tex. 1976). Thus, according to DART, we must use the substantial evidence standard of review under government code section 2001.174, which provides that, in a contested case before a state agency, if the law does not define the scope of judicial review, the review is under the substantial-evidence standard. Tex. Gov't Code Ann. § 2001.174 (West 2008). However, section 2001.174 does not apply to DART because it is not a state agency. *See id.* § 2001.003(7) (West 2008).

Administrative rules, such as the T's procedural regulations here, are ordinarily construed like statutes. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011). In statutes, the word "may" is discretionary and grants permission or power. *See* Tex. Gov't Code Ann. § 311.016(1) (West 2013). Thus, the procurement regulations allow a party in its discretion to seek judicial review of an ALJ's decision, and they also defer to the specific contract to provide a standard of review. We find no law imposing a gapfiller standard of judicial review in the absence of an agreement otherwise. The parties could have chosen to include in their contract that any ALJ decision would be reviewed under the substantial evidence rule, but they did not. *See, e.g.*, *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 664 (Tex. 2008) (noting general rule that parties may contract as they see fit so long as agreement does not

7

violate law or public policy). We conclude and hold that the trial court did not err by holding a trial de novo, and we overrule appellants' first issue.

## Jury Charge Was Proper

In their third issue, appellants claim the trial court erred by refusing to include a question in the jury charge asking which party breached the contract first.

The charge included a question asking if appellants had failed to comply with the contract, a separate question asking if Agent had failed to comply with the contract, and a third question asking whether, if appellants had failed to comply, that failure was excused. The jury found that both appellants and Agent had failed to comply with the contract, but it also found that appellants' failure to comply was not excused.

The charge instructed the jury that "failure to comply by [appellants] is excused if [Agent] *was* in default under the contract." [Emphasis added.] Thus, to find that appellants' failure to comply was excused, the jury had to find that at the time of appellants' failure to comply, Agent "was [already] in default." *Cf.* Tex. Gov't Code Ann. § 311.011 (West 2013) (providing that when construing statutes, words and phrases must be construed according to the rules of grammar and common usage); *Standley v. Sansom*, 367 S.W.3d 343, 350 (Tex. App.—San Antonio 2012, pet. denied) (explaining that words of ordinary meaning need not be defined in jury charge). Because the submitted question does not differ in substance from appellants' requested instruction, but merely in

8

wording, the trial court did not err. *See* Tex. R. App. P. 44.1(a); Tex. R. Civ. P. 277, 278 ("A judgment shall not be reversed because of the failure to submit . . . different shades of the same question."); *H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 260 (Tex. 1992) (holding that trial court's failure to submit requested broad-form question was not reversible error when submitted granulated-form instruction "fairly submitted to the jury the disputed issues of fact and . . . incorporated a correct legal standard for the jury to apply"); *Sewing v. Bowman*, 371 S.W.3d 321, 340–41 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd); *PIC Realty Corp. v. Southfield Farms, Inc.*, 832 S.W.2d 610, 613 (Tex. App.—Corpus Christi 1992, no writ). We overrule appellants' third issue.

## Trial Court Did Not Err in Refusing to Submit Instructions

Appellants argue in their fourth issue that the trial court erred by failing to submit questions in the jury charge on acceptance, rejection, and revocation of acceptance under the UCC when sufficient evidence supported these instructions. *See* Tex. Bus. & Com. Code Ann. §§ 2.105(f), 2.601, 2.606 (West 2009). Appellants tendered proposed instructions to the trial court. The first instruction asked, "Did [appellants] accept the fareboxes not delivered to [appellants]," followed by an explanation of when acceptance occurs. The second instruction stated that if the fareboxes failed to conform in any way to the contract, appellants could either revoke acceptance, accept all of the fareboxes, or accept some of the fareboxes and reject the rest. Finally, the third proposed instruction asked whether appellants revoked their acceptance.

9

Appellants' requested instructions, while correct under the UCC, are not pertinent to the case as pled. *See* Tex. R. Civ. P. 278 (providing that court must give instructions raised by written pleadings); *Tex. Workers' Comp. Ins. Fund v. Mandibauer*, 34 S.W.3d 909, 912 (Tex. 2000) (op. on reh'g). Agent did not seek the unpaid contract price for the remaining fareboxes; instead, it sought to recover the damages outlined in the termination for convenience provision of the contract, which provides that if appellants terminated the contract for convenience, and not default, Agent could recover "its costs, including contract close-out costs." Agent's evidence regarding costs consisted of items such as parts and labor supply costs, as well as leasing and facilities costs. Agent did not seek reimbursement for the contract price for the remainder of the boxes that were to be installed in the rest of the T buses and the DART buses, but were not. We therefore conclude and hold the trial court's refusal to submit these proposed instructions was not reversible error. *See, e.g.*, *Houghton v. Port Terminal R.R. Ass'n*, 999 S.W.2d 39, 45 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

Accordingly, we overrule appellants' fourth issue.

### Trial Court Did Not Err by Denying Judgment Notwithstanding the Verdict and Appellants' Motion for Judgment

In their fifth issue, appellants contend that the trial court erred by denying their motion for judgment and motion for judgment notwithstanding the verdict (JNOV) because the great weight and preponderance of the evidence shows that Agent breached the agreement first and, alternatively, because no evidence

10

exists that appellants committed the first material breach of the contract. According to Agent, appellants committed the first material breach after deciding they no longer wanted validating fareboxes, improperly issuing the stop order, and thereafter refusing to pay the costs set forth in the termination for convenience provision of the contract.

**Standard of Review**

A trial court cannot disregard a jury's answer and render a JNOV because the answer is against the great weight and preponderance of the evidence. *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 594 (Tex. 1986); *Duncan Land & Exploration, Inc. v. Littlepage*, 984 S.W.2d 318, 325 (Tex. App.—Fort Worth 1998, pet. denied). In such a situation, the trial court may only grant a new trial. *Alm*, 717 S.W.2d at 594; *see also* Tex. R. Civ. P. 301 (providing that court may disregard jury finding that has no evidentiary support). Thus, a great weight and preponderance complaint must be brought in a motion for new trial. *E.g.*, *Murphy v. McDaniel*, No. 05-03-01045-CV, 2004 WL 2404518, at *4 (Tex. App.—Dallas Oct. 28, 2004, no pet.) (mem. op.). Because appellants' issue seeks a review of whether the trial court erred by denying the motion for judgment or JNOV, not a motion for new trial, we will consider appellants' alternative argument that there is no evidence that their failure to comply occurred before Agent's in the context of that discussion. However, because appellants also preserved their great weight and preponderance complaint in a motion for new trial, we will review it under the appropriate standard of review. *See id.*

11

**JNOV Standard**

A trial court may disregard a jury verdict and render judgment notwithstanding the verdict (JNOV) if no evidence supports the jury finding on an issue necessary to liability or if a directed verdict would have been proper. *See* Tex. R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991). A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) when the evidence is insufficient to raise a material fact issue. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 454 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g).

To determine whether the trial court erred by rendering a JNOV, we view the evidence in the light most favorable to the verdict under the well-settled standards that govern legal sufficiency review. *See Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009); *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003). We must credit evidence favoring the jury verdict if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009); *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007).

**Great Weight and Preponderance Standard**

When the party without the burden of proof on a fact issue complains of an adverse fact finding, that party must show that there is "insufficient evidence" supporting the finding, that is, that the credible evidence supporting the finding is too weak or that the finding is against the great weight and preponderance of the credible evidence contrary to the finding. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); W. Wendall Hall, *Hall's Standards of Review in Texas*, 42 St. Mary's L.J. 3, 41–42 (2010).

**Theories of the Case**

Agent's theory of the case is that appellants decided after the signing of the contract and the installation of the first fareboxes on the T buses that they no longer wanted validating fareboxes and that they started looking for another company to reinstall registering fareboxes. Instead of terminating for convenience as a result and paying what they owed under that provision, appellants waited, failed to pay, and eventually attempted to terminate the contract for default to avoid paying the amounts under the convenience provision.[3]

Appellants' theory of the case is that Agent delivered a defective product from the beginning, that they only started looking for an alternative to Agent's

---

[3]Agent's proposed charge instructed that appellants "failed to comply with the [c]ontract" if "[t]he termination of the [c]ontract was a termination for convenience and not for default."

fareboxes when those boxes repeatedly failed the ISQT, that they tried to see if they could terminate for convenience because they do not like to default contracts, but that they eventually had to terminate for Agent's default in providing a defective product because they could not properly verify the amounts in the termination for convenience provision due to Agent's faulty recordkeeping.

**Evidence at Trial**

### Agent's Witnesses

Brian Waters, Agent's president from 2000 to 2003, testified that DART solicited bids for validating fareboxes to be put into their buses; formerly the buses had registering fareboxes. Registering fareboxes only identify that a coin or paper has been put into the system; validating fareboxes rely on imaging and recognize the difference between types of bills and coins. DART wanted validating fareboxes that would integrate with other computer technology it was going to install on its buses pursuant to a federal government grant.

DART tested Agent's prototype and even though it did not perform perfectly in the warehouse, DART cleared it for purposes of entering into a contract with Agent. According to Waters, the contract Agent signed with DART was not a typical government contract; Agent had the burden to pay for all pre-installation parts and expenses before payment. After they signed the contract and DART issued a notice to proceed, Agent ordered everything needed to assemble and install 1,100 validating fareboxes; the lead time to assemble a box is ninety to one hundred twenty days.

14

Once the initial twenty fareboxes were installed on the T buses, physical security became an issue because the T discovered a theft ring of employees who had targeted the registering fareboxes. At that point, the T demanded modifications to Agent's fareboxes to increase their physical security. Agent succeeded in modifying the boxes so that a T supervisor could not breach them even after working for a half hour or more.

Waters testified that an ISQT is "a shakeout test to validate every . . . phase of what's going to be required to roll out the equipment system wide" and that it involved not only the installation but also the training of the people at the T and DART who would be working with them. According to Waters, typically any deficiencies in a product during an ISQT are resolved by corrective action and additional testing, not by terminating the contract. He disputed that the fareboxes failed the ISQT tests. Waters testified that he would never enter into a contract in which the authorities could terminate for default based upon failures during the ISQT because "it would defeat the purpose of the [ISQT], which is to enable the authority and the contractor to measure the performance of the equipment in a real life environment and modify it if necessary so the equipment can be rolled out and installed system wide." He also said Agent would never have entered into this contract if appellants could terminate for default because of failures during the ISQT. Appellants had tried to include such a provision in the contract and he refused. Finally, Waters testified that there was nothing unusual about the failure rate of the boxes during the ISQT: it was inherent in the new

technology, and only two companies were doing that type of technology at the time.

Waters testified that DART and the T made up seventy-five percent of Agent's expenses and work. Because appellants did not reimburse Agent under the convenience clause when it had expended so much money for materials up front, Agent had to file for bankruptcy. Waters explained in detail how the auditor sent by appellants to investigate a possible termination for convenience could have determined from the records they made available to him which expenses were attributable to the contract with appellants.

On cross-examination, Waters admitted that Agent was late on all scheduled deadlines in the contract.

The president and executive director of the T testified that he had been hired in February 2003 and signed the termination for default letter in December 2003. He had not been personally acquainted with the contract; his staff told him the contract was being terminated for default because the fareboxes did not work when they were tested in the buses. When questioned about the accounting report, he said that the T questioned costs they believed should not be reimbursed and that needed to be examined further.

A governmental accounting expert testified that Agent's professed method of keeping accounting records was acceptable in a government contract situation. Agent's accountant testified about how he calculated Agent's

16

reimbursable expenses; he also explained that its accounting system was very typical for a company its size.

The jury heard excerpts from the deposition of Deanna Anderson, the director of planning and scheduling for the T from 1994 to July 2002. Anderson testified that after the discovery of the theft ring at the T in spring 2001, security of the fareboxes became a more significant issue and as a result appellants requested or discussed modifications with Agent. She also agreed that adjustments had to be made to the original design to accommodate the security concern. Anderson recalled that at that time, the T contacted a competitor of Agent's, GFI, to do a demo for registering fareboxes while the ISQT with Agent was in progress.

**Appellants' Witnesses**

Chris Patrick, a DART manager in the IT department, testified that he worked on the lab testing of the fareboxes in 2000; the boxes had problems with the O rings breaking and not being strong enough to move dollar bills. In addition, the coin mechanism would jam. Appellants experienced similar issues during the ISQT. He said that DART liked the system at first and that it would interface with other technology in the buses. But that type of system became less critical when the security issues became paramount; appellants became worried about anyone accessing the stored information in the fareboxes and so they would not be able to use the fareboxes for their intended purpose. In

17

addition, after September 11, 2001, sales tax revenue dropped, and the federal government reduced its funding, so appellants had to "scrap" the VBS project.

Patrick verified that one of the tests, which required an on-bus attendant to hold proferred bills so that they could be checked against the fareboxes' electronic record, was suspended because one of the on-bus administrators was robbed of the bills he was holding for the test. However, he also agreed that such a test was important so that the parties would know why certain bills had been rejected by the fareboxes. According to Patrick, the agreement to suspend that test was mutual.

Donald Warner, a former senior manager of technical services for DART who worked on the ISQT, testified that he was the project manager with the final decision and he chaired the failure review board. According to Warner, he was not told to "submarine" the contract. He was neither in charge of nor involved with the cancelling of the contract. He testified that there were disputes between appellants and Agent over whether tests were passed; he said his only job was to make sure that mechanical items fit specified performance requirements. There were too many failures.

Rebecca Thornton, assistant vice president of accounting at the T at the time of trial, testified that the T needed new boxes in its buses regardless of whether it used validating or registering fareboxes. The T agreed to be the in-service testing fleet because its fleet was smaller, installation would be faster, and installation could be accomplished more quickly. She was concerned about

the project schedule because of the short turn-around time between the scheduled ISQT and full installation of the boxes.  When she expressed these concerns to Waters, he said Agent was willing to assume the risk of purchasing the materials necessary to meet the aggressive deadlines.  Her understanding was that the boxes had to pass the ISQT before being installed in the entire fleet.

According to Thornton, Agent was behind on deadlines almost immediately; it installed the first twenty boxes over a weekend and she had operations people yelling at her the first thing Monday morning.  Some buses could not leave for their routes because of problems with the software.  Other problems were the cash box shaking and falling on the bus floors, deep bill jams, and lanyards coming loose.

According to Thornton, Agent agreed to postpone the ISQT in November 2000 because of these problems.  Agent and appellants had lots of meetings in November and December 2000 and were trying to fix recurring concerns.  However, according to Thornton, progress was "a little bit on the slow side."  In March 2001, the T rejected a proposal for a new ISQT because it called for a person on each vehicle to observe the testing, and the T did not have the staff or resources to provide that.  However, the T eventually decided to hire temporaries for the job.  In a March 16, 2001 email, Thornton wrote:  "We have resolved many of the issues that we had with [the] farebox system and need to move forward on this project."  She clarified what she meant in her testimony:  "[W]e were getting closer to having everything resolved and being ready to get . . . to

19

the next phase of the project, meaning installed on all vehicles.  We felt like we were getting towards that point."  Thornton also said that in March 2001, appellants still had the intent to continue the ISQT and finish installation.

The T uncovered a theft ring on its buses in spring 2001.  After the discovery, on April 13, 2001, Thornton sent the following email—entitled "After the recent farebox theft incident BC Craddock felt that it was necessary to test the security"—to the then-general manager and CEO of the T:

> Under the contract we have with Agent, I believe we will have to provide Agent with an opportunity to make modifications to the farebox system.  How long these modifications will take is something I don't know.
>
> In the mean[]time, I would like to get a GFI Odyssey box on property for BC to test.  If BC determines that the Odyssey box would be more secure than the Agent Box then we would need to proceed with canceling the Agent contract and doing a sole source procurement with GFI.  Phyllis will need to be brought in to the picture to verify that this is how we can proceed.
>
> Ron Anderson is contacting GFI today to see if they will provide a GFI box for us to review.

Thornton explained that she was merely being prudent in responding to the security incident the T had just discovered.  She had not questioned the security of the Agent boxes until that happened and had assumed that Agent's fareboxes had "top notch" security.  She did say that appellants gave Agent the opportunity to correct the security issue, and it did so satisfactorily.

During the same time period, the parties were negotiating the restart of the ISQT, which they agreed to resume effective April 16, 2001.  According to

Thornton, after the ISQT resumed, the fareboxes did not meet the revenue accuracy test. She testified that their performance was measured using an "industry standard," but there was other evidence that this was a new technology and only two companies were providing it. Thornton stated that she could not substantiate Waters's claim about money not being backed out of a certain test because Agent did not fill out the proper form and Waters never told her about it. She could never reconcile her numbers from the testing and Waters's.

An April 30, 2001 letter to Waters from appellants—along with Capital Metro, with whom Agent also had a contract to install validating fareboxes—sets forth two major concerns with the progress of the resumed ISQT:

> Agent has failed to perform in a satisfactory manner on any of the installations. The three Authorities are working together to assist Agent in meeting its responsibilities under these contracts. The purpose of this letter is to describe the substantive guidelines the Authorities expect Agent to meet if the installations are to go forward. Nothing in this letter is intended to relieve Agent of any of its responsibilities under its contracts with the Transit Authorities.

> There are two tracks on which Agent must move to resolve the outstanding issues. First, Agent must produce immediate results in addressing two "fatal flaws". Second, Agent must develop a plan acceptable to the Transit Authorities for addressing all open technical issues.

> The "fatal flaws" that must be corrected are:

> 1. Physical security of all components of the farebox system. This must be addressed by Agent having all security issues resolved to the satisfaction of the Transit Authorities by May 16, 2001.

> 2. Demonstration of Agent's ability to perform its obligations under its contracts and for the system to meet the

21

specification requirements.  In order to resolve this "fatal flaw"' Agent Systems, Inc. must accomplish and allow the following:

- An internal audit team (provided by the Authorities) will review the current financial statements of Agent Systems, Inc. to determine that Agent has the financial stability to continue with this project.  This review must be acceptable to the Authorities by May 23, 2001.

- Successful completion of the current T/DART ISQT and RMAT tests, which are scheduled to conclude on May 16, 2001.

- The Authorities shall conduct a manufacturing review of Agent Systems, Inc.  This review will involve inspecting your facility to make sure that Agent Systems, Inc. has the ability for mass production.  This review will be conducted by May 23, 2001.  Agent must identify a point of contact for this review and provide its quality plan to the Transit Authorities by May 3, 2001.

- Agent will provide staffing plans, updated project schedules and a plan for supporting the project commitments for the T/DART and Capital Metro installations by May 16, 2001. The staffing plans shall include the resumes of all its employees to ensure that adequate experienced personnel are being provided to support the product.  Also, a list of subcontractors shall be provided. These lists must be provided to the Authorities by May 16, 2001.

Attached is a list of outstanding technical issues the Authorities have been attempting to resolve with Agent.  Should Agent be successful in addressing the "fatal flaws" above, all of these issues must be addressed within the time frames established on the list.  It is anticipated that additional items will be added to the list if the installation proceeds.

The Transit Authorities realize the benefit of implementing the Agent farebox system.  Having a competitive alternative in the marketplace is good for the industry.  The promise of the Agent farebox system also is great.  However, that promise only can be achieved if Agent performs.  Failure to comply with the above issues

22

may result in termination of our contracts. It is not our desire to proceed with this action, but we will do so if necessary.

The trial court admitted a report prepared for the T and issued in May 2001, assessing the security of the T's older, registering fareboxes. The report indicates failure and security issues with those fareboxes, not only as to their physical aspect, but also as to how they were being serviced and counted. The report also made specific recommendations regarding necessary changes to security procedures with respect to the older fareboxes.

Thornton acknowledged that Agent eventually resolved the security concerns about its fareboxes, but she testified that the parties continued to have mechanical problems even after the security issues were addressed.

Thornton testified that the T considered Agent in default on June 4, 2001. On that day, the assistant general manager of the T sent Waters a letter, in which he outlined the "fatal flaws" that appellants believed Agent had not addressed and stated, "[U]nless within 10 days from its receipt of this notice, Agent . . . shows good cause why this contract should not be terminated, the contract for the purchase of the farebox will be terminated."

Thornton did not think appellants' concern was the performance of validating boxes in general, just the particular ones that Agent had installed. She agreed, however, that ninety percent of the failed revenue test was attributable to one day, which Waters had disputed. Thornton said that even though the contract provided that the parties would retest and take corrective action during

the ISQT, she said that the T would not allow corrective action it did not agree with. She said Waters never proposed a different corrective action acceptable to the T.

Despite appellants' June 4, 2001 letter threatening to terminate the contract, Deanna Anderson sent Waters a letter dated June 12, 2001, in which she confirmed a telephone conversation that day and stated, "We would like to proceed with the Proposed Engineering Changes #1209 and 1210. . . . Furthermore, we would like to analyze any recent security changes made to the cashbox and farebox . . . [on] June 13, 2001 . . . at the T."

On June 15, 2001, Waters responded in detail to the June 4 letter, outlining Agent's attempted corrective actions to improve the farebox design. He concluded, "The system now performs as the Authorities requested. Agent Systems has cooperated at every step. Agent Systems has met its obligations, and looks to the Authorities to complete the contract." Additionally, Agent's attorney sent the T's assistant general manager a letter setting forth Agent's position that there was no cause for termination.

Waters continued corresponding with appellants throughout June and July with proposed corrective measures.

On July 5, 2001, the parties met so that Agent could demonstrate some of the proposed corrective actions. Nevertheless, on August 9, 2001, appellants sent Agent a letter directing that all work on the project be ceased:

24

After considering the corrective actions proposed by Agent Systems, the T and DART have concluded that such actions will not eliminate the causes of the ISQT/RMAT test failures and that further testing is not in the best interest of the T and DART. Accordingly, in accordance with paragraph 8.7 of the ISQT/RMAT Test Plan, the Test is determined to have been failed and the corrective action rejected.

Agent Systems is therefore directed to immediately suspend all work on the subject contract, including development, installation, production and support efforts. Further, you will take all actions necessary to minimize costs, including, but not limited to, suspension of work on subcontracts and orders which have been placed until such time as a decision is communicated to you concerning the continuation of subject contract.

Thornton attended a meeting on August 28, 2001 with Waters, Patterson, Craddock, Deanna Anderson, and other T and DART representatives.[4] Thornton took notes documenting Anderson's introduction to the meeting:

Brian and everybody, thanks for coming. Brian, The T and DART have met and decided how to proceed with the contract. We, the T and DART, want to go our separate ways with Agent Systems. We propose the way to do this is a No-Cost Termination. We will pay the invoice amount of $543,857.85 and walk away with no grievances. If this is not an option, then we will talk to our senior management and proceed with termination by default.

Thornton described this proposal as meaning, "Everybody, here's what we owe. You can verify it. Everybody's happy, and we will walk away."

When asked whether the T had simply decided to contract with a different company, Thornton said that the parties had put so much work into the product already and could not make it work. Thornton admitted that appellants had to "scrap" the VBS project after September 11, 2001 because of reduced federal

---

[4]A recorded version of the meeting was also played for the jury.

25

funding and reduced revenue. She further admitted that the T competitively bid registering fareboxes from a competitor of Agent for all of its fleet in 2002.

BC Craddock worked for the T as the VBS coordinator. He recalled that in the beginning of the collaboration with Agent, there was a sense that Agent's fareboxes were just what was needed, but the T had problems with them on the first day. By March 16, 2001, many security issues had been resolved, but the T was still having mechanical issues.

John Loving is a CPA whose specialty is government contracting. DART hired him in mid 2002, and he issued his report in January 2003. He had issues with the way Agent did its accounting and had trouble getting the information he needed. He did not think he needed to look at Agent's bill of materials for items. He left the decision of whether to decide if it would be reasonable to pay for costs incurred after the stoppage of work to the contracting officer. In a communication from Loving to DART, Loving referred to his analysis as being for a "termination for convenience program." He prepared a report and dated it January 8, 2003; DART told him around 2006 that they had never seen it.

**Pertinent Contract Provisions**

The contract itself sets forth two termination methods. The first, entitled "Termination for Convenience," states,

> The T may terminate, in whole or in part, for its convenience and at any time, any contract resulting from or related to this solicitation by giving written notice to the contractor specifying that the termination is for the convenience of the T, and the termination date. Contractor shall be paid its costs, including contract close-out costs, and profit

on work performed up to the time of termination. Contractor shall promptly submit its termination claim to the T to be paid. If the contractor has any property in its possession belonging to the T, contractor will account for the same, and dispose of it in the manner the T directs.

The "Termination for Default" subsection immediately follows:

If contractor fails to deliver conforming goods, materials, or supplies in accordance with the contract delivery schedule specified in this solicitation or in any contract resulting from or related to this solicitation (when the contract involves the purchase or procurement of such items) or contractor fails to perform in the manner called for in this solicitation or in any such contract (when the contract involves performing work or rendering services) or contractor fails to comply with any other provision of any such contract, the T may terminate such contract(s) for default. Termination shall be effected by serving a notice of termination on contractor setting forth the manner in which contractor is in default and the effective date of termination. Contractor will be paid only the contract price for conforming goods, materials, or supplies delivered and accepted, or the actual value to the T of work completed or services performed up to the time of termination in accordance with the manner of performance set forth in the contract. Contractor shall promptly submit its termination claim to the T and the parties shall negotiate the termination settlement, if any, to be paid to contractor. The contractor shall account for any property in its possession paid for from funds received from the T, and property supplied to the contractor by the T.

The contract also provides that "[s]uccessful completion of the [ISQT] shall be a prerequisite for full installation rollout of the fare collection system." Further, in the test plan that resumed April 16, 2001, the parties agreed:

The Test may be suspended at the discretion of the agency when it is deemed an unsatisfactory number of failures or incidents have occurred. Restarting at the beginning of the test shall be at the discretion of the agency only after satisfactory resolution and corrective action of the failures/incidents. In no case would the test be extended beyond 90 days.

In the event that any of the four (4) specified tests fail, Agent Systems shall propose to the Authorities a corrective action that will eliminate the source of the test failure. It shall be the option of the Authorities to:

○ accept the proposed corrective action and deem the Test successfully completed, or

○ approve the corrective action and restart the test as described below, or

○ reject the proposed corrective . . . action and fail the Test.

. . . .

If the Authorities elect to approve the corrective action and restart the Test, only the portion of the test that failed previously will be restarted. If the Authorities elect to restart the Test, the Test shall be extended in 7-day increments until such time as the Test requirements are met in a contiguous 14 day period.

Although the ISQT plan does indicate that appellants could reject the corrective action and fail the test, nothing in the contract makes failure of the ISQT an event of default; instead, Agent's passing the ISQT was a prerequisite to full production and installation of the remaining fareboxes. Thornton herself acknowledged this in her April 13, 2001 email, in which she noted that under the contract Agent should be provided an opportunity to make modifications even though she was recommending that GFI be contacted for possible replacement boxes. Waters also testified that in March 2001, appellants had tried to negotiate a contract modification that would have allowed them to terminate the contract for "cause" if the requirements of the ISQT had not been met by April 9, 2001; Agent refused the modification.

28

**Analysis**

The jury could have reasonably inferred from the evidence presented that appellants were willing to continue the ISQT—and considered the repeated test failures and resulting modifications part of the testing process in accordance with the contract—until they decided that validating fareboxes were not what they needed and would not be substantially funded by federal funds, and that appellants at that point would have terminated the contract regardless of what changes were made. Additionally, the jury could have reasonably inferred that, having decided to terminate the contract, appellants investigated a termination for convenience but after deciding it would be too costly, failed to act in good faith by attempting to terminate for default instead.[5] Accordingly, we conclude and hold that the evidence is both legally and factually sufficient to support the jury's verdict and, thus, that the trial court did not err by denying the JNOV and motion for new trial. *See, e.g.*, *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *McKenzie v. Positive Action Int'l, Inc.*, No. 01-10-01073-CV, 2012 WL 1454478, at *14–15 (Tex. App.—Houston [1st Dist.] Apr. 26, 2012, pet. denied) (mem. op.). We overrule appellants' fifth issue.

---

[5]The court's charge instructed the jury on good faith as follows: "In addition to the language of the agreement, the law imposes on a party to a contract a duty to perform or enforce the contract in good faith. In that connection, good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing."

**Question on Damages Appropriate**

Appellants contend in their sixth issue that the trial court erred by overruling their motion for instructed verdict, by including a jury question on damages, and by entering judgment on the jury's verdict for Agent because local government code section 271.153(a) limits a damage award to "the balance due and owed" under the contract.

Section 271.153(a) provides, "[T]he total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to the following:  (1) the balance due and owed by the local governmental entity under the contract as it may have been amended . . . ."  Tex. Loc. Gov't Code Ann. § 271.153(a) (West Supp. 2014). Appellants claim that they owed Agent only for delivery and installation of the first twenty fareboxes and that they already paid that amount in the settlement during Agent's bankruptcy.  Appellants' sixth issue is predicated on their argument that they do not owe the amounts articulated in the termination for convenience clause of the contract.  Because we have determined that the evidence supports Agent's contention that appellants owed additional money under the termination for convenience clause, we likewise conclude and hold that section 271.153(a) does not preclude the jury's damage award.  *See Zachry Constr. Corp. v. Port of Houston Auth. of Harris Cnty.*, No. 12-0772, 2014 WL 4472616, at *7 (Tex. Aug. 29, 2014) ("A 'balance due and owed . . . under the contract' is simply the

30

amount of damages for breach of contract payable and unpaid."). We overrule appellants' sixth issue.

## Prejudgment and Postjudgment Interest

In their seventh issue, appellants contend the trial court erred by awarding prejudgment interest at the rate of six percent on the damage award because neither the contract nor any statute allows the recovery of prejudgment interest.

The version of section 271.153(a)(3) of the local government code applicable to this contract provided for the recovery of "interest as allowed by law." Act of May 23, 2005, 79th Leg., R.S., ch. 604, § 1, 2005 Tex. Gen. Laws 1548, 1549. Agent argues on appeal, and argued at trial, that it is entitled to prejudgment interest under either section 302.002 of the finance code or section 304.103 of the finance code.

Agent was not entitled to recover prejudgment interest in accordance with finance code section 304.103 because that section applies only to wrongful death, property damage, or personal injury cases, not breach of contract cases. Tex. Fin. Code §§ 304.101, .103 (West 2006); *see Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528, 530 (Tex. 1998) (op. on reh'g). Additionally, Agent cannot recover prejudgment interest under section 302.002 of the finance code; that section does not apply to a party who is solely a judgment creditor. Tex. Fin. Code Ann. § 302.002 (West 2006); *Smith v. Huston*, 251 S.W.3d 808, 827–28 (Tex. App.—Fort Worth 2008, pet. denied).

31

Appellants contend that "allowed by law" means "permitted by the Agreement or a statute" only.[6]  However, even in the absence of a statute or contractual provision providing for the recovery of prejudgment interest, prejudgment interest may be awarded on a breach of contract claim under common law equitable principles; in such a case, prejudgment interest accrues at the rate of postjudgment interest and is computed as simple interest.  *Johnson & Higgins*, 962 S.W.2d at 532 (holding that breach of contract claim was not claim for property damage); *see also* Tex. Fin. Code Ann. § 304.003 (West 2006). "The commonly understood meaning of 'law' includes judicial decisions and rules promulgated by the judiciary, such as rules of procedure and evidence."  *In re City of Georgetown*, 53 S.W.3d 328, 332 (Tex. 2001) (orig. proceeding) (construing term "other law" in Open Records Act).  Because the term "law" includes common law in the absence of some indication otherwise, the language in section 271.153(a) authorizes the imposition of prejudgment interest in this case according to common law equitable principles.  We conclude and hold that the trial court did not err by including prejudgment interest in the judgment.

Appellants also dispute the six percent interest rate applied by the trial court to both prejudgment and postjudgment interest; they contend that it should

---

[6]Both cases appellants cite are inapposite; likewise, the federal case is not controlling authority.  *See GLF Constr. Corp. v. DART*, 546 F. App'x 429, No. 12-11017, 2013 WL 5433777 (5th Cir. Oct. 1, 2013); *Port Neches-Groves ISD v. Pyramid Constructors, L.L.P.*, 281 S.W.3d 142, 150 (Tex. App.—Beaumont 2009, pet. denied); *see also Davenport v. Garcia*, 834 S.W.2d 4, 20 (Tex. 1992) (orig. proceeding).

have been no more than five percent. Section 304.003(c)(2) of the finance code provides that the postjudgment interest rate on a money judgment to which section 304.002 does not apply is "five percent a year if the prime rate as published by the Board of Governors of the Federal Reserve System . . . is less than five percent." Tex. Fin. Code Ann. § 304.003(c)(2). We may take judicial notice of the correct published rate on appeal, which is published on the Office of the Consumer Credit Commissioner's website. *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.*, 878 S.W.2d 598, 600 (Tex. 1994); *Tenn. Gas Pipeline Co. v. Technip USA Corp.*, No. 01-06-00535-CV, 2008 WL 3876141, at *25 (Tex. App.—Houston [1st Dist.] Aug. 21, 2008, pets. denied) (mem. op. on reh'g). That website shows that the historical postjudgment interest rate during the entire year of 2012 when the trial court signed this judgment was five percent. Judgment Rate Summary, Office of Consumer Credit Comm'r, www.occc.state.tx.us/pages/int_rates/ratesummaries.html (follow "Judgment" hyperlink). Therefore, we conclude and hold that the trial court should have calculated prejudgment and postjudgment interest at the rate of five percent instead of six percent.

Finally, appellants dispute the date from which the trial court calculated prejudgment interest. As adopted by the supreme court in *Johnson & Higgins*, common law prejudgment interest begins to accrue "on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed." *Johnson & Higgins*, 992 S.W.2d at 531; *DaimlerChrysler Motors Co.*

33

*v. Manuel*, 362 S.W.3d 160, 194 (Tex. App.—Fort Worth 2012, no pet.). A claim in this notice context is a demand for compensation or an assertion of a right to be paid. *Johnson & Higgins*, 962 S.W.2d at 531. The trial court appears to have awarded prejudgment interest at six percent from either August 26 or 27, 2001 through October 4, 2012, the day before the judgment was rendered. However, there is no evidence of a written notice of a claim being made as soon as February 2001; appellants did not issue the stop work order halting the ISQT until August 2001. It appears that the trial court's prejudgment interest calculation was erroneously based on Agent's assertion that section 302.002 applies to this case. *See* Tex. Fin. Code Ann. § 302.002 (calculating prejudgment interest "beginning on the 30th day after the date on which the amount is due"). Accordingly, we conclude and hold that although Agent was entitled to prejudgment interest, the amount of prejudgment interest awarded was calculated erroneously. *See Pringle v. Moon*, 158 S.W.3d 607, 611–12 (Tex. App.—Fort Worth 2005, no pet.). Because neither party has briefed what date should apply, and because appellants claim that they are entitled to the tolling of the accrual of interest while a settlement offer was open, we will remand the issue to the trial court for a recalculation of the correct amount of prejudgment interest. *See id.*

We overrule appellant's seventh issue in part and sustain it in part.

## Agent's Cross Point

Agent has raised a cross point complaining about the trial court's denial of one of its requested jury instructions. Because we have not sustained any of appellant's issues related to liability, we need not address the cross point. *See* Tex. R. App. P. 47.1; *Pettus v. Pettus*, 237 S.W.3d 405, 420 n.12 (Tex. App.—Fort Worth 2007, pet. denied).

## Conclusion

Having overruled the majority of appellant's issues, we affirm the trial court's judgment except for the award of prejudgment and postjudgment interest. Having sustained appellant's seventh issue in part, we modify the award of postjudgment interest to be five percent, and we remand this case to the trial court solely to determine the date from which prejudgment interest should begin to accrue and to recalculate that interest from the accrual date at the rate of five percent rather than six percent.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED: November 26, 2014